1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**F I L E D**
CLERK, U.S. DISTRICT COURT

4/27/2023

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ TV _____ DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

June 2022 Grand Jury

UNITED STATES OF AMERICA,

        Plaintiff,

        v.

EDWARD COURDY,
  aka "Eddie Courdy,"
LINDEN FELLERMAN,
  aka "Lin Fellerman,"
GUY BENOIT,
STEVEN KENNEDY,
  aka "Steven Morgan,"
SAYYID QUADRI,
  aka "Said Quadri,"
  aka "Sayid Quadri,"
AHMAD SHOAIB,
  aka "Shoba,"
  aka "Shobi,"
  aka "Shobie,"
  aka "Shoby,"
JOHN BEEBE,
MICHAEL YOUNG,
  aka "Mike Young,"
LANCE JOHNSON,
  aka "Musa Rasul,"
  aka "Mussa,"
JENNY SULLIVAN,
VERONICA CROSSWELL,
ERIC BAUER,
RANDY GRABEEL,
  aka "Randy Grabel," and
DEBRA VOGEL,
  aka "Debbie Vogel,"

CR 2:23-cr-00200-MCS

I N D I C T M E N T

[18 U.S.C. § 1962(d): Racketeer
Influenced and Corrupt
Organizations Conspiracy; 18
U.S.C. § 1343: Wire Fraud; 18
U.S.C. §§ 1963 and 982: Criminal
Forfeiture]

Defendants.

The Grand Jury charges:

COUNT ONE

[18 U.S.C. § 1962(d)]

[ALL DEFENDANTS]

A.    INTRODUCTORY ALLEGATIONS

At times relevant to this Indictment:

1.    Defendants EDWARD COURDY, also known as ("aka") "Eddie Courdy"; LINDEN FELLERMAN, aka "Lin Fellerman"; GUY BENOIT; STEVEN KENNEDY, aka "Steven Morgan"; SAYYID QUADRI, aka "Said Quadri," aka "Sayid Quadri"; AHMAD SHOAIB, aka "Shoba," aka "Shobi," aka "Shobie," aka "Shoby"; JOHN BEEBE; MICHAEL YOUNG, aka "Mike Young"; LANCE JOHNSON, aka "Musa Rasul," aka "Mussa"; JENNY SULLIVAN; VERONICA CROSSWELL; ERIC BAUER; RANDY GRABEEL, aka "Randy Grabel"; and DEBRA VOGEL, aka "Debbie Vogel"; and others known and unknown to the Grand Jury, were members and associates of a criminal organization referred to hereinafter as "THE ENTERPRISE."  In furtherance of a scheme to fraudulently obtain money from American consumers' bank accounts, members and associates of THE ENTERPRISE engaged in, among other things, mail, wire, and bank fraud; identity theft; access device fraud; and money laundering.  THE ENTERPRISE operated in the Central District of California and elsewhere.

2.    THE ENTERPRISE, including its leaders, members, and associates, constituted an "enterprise," as defined in Title 18, United States Code, Section 1961(4), that is, a group of individuals associated in fact, although not a legal entity.  THE ENTERPRISE constituted an ongoing organization whose members functioned as a

continuing unit for a common purpose of achieving the objectives of THE ENTERPRISE.  THE ENTERPRISE engaged in, and its activities affected, interstate and foreign commerce.

3.    Members and associates of THE ENTERPRISE played different roles at different times:

a.    Merchants:  Merchants used business entities (each a "Shell Entity") to offer to consumer-victims subscriptions for some service or product, such as cloud storage, for a recurring charge. In fact, the Shell Entities served as cover for a scheme to make unauthorized debits against consumer-victims' bank accounts (the "Consumer Bank Accounts").  Merchants purchased identifying and financial information of consumer-victims, at times through brokers, and caused unauthorized debits to be originated against Consumer Bank Accounts, many of which were held or serviced by federally insured financial institutions (the "Consumer Banks").  These unauthorized debits removed funds from the Consumer Bank Accounts and caused them to be deposited into bank accounts controlled by or for the Shell Entities (each a "Shell Entity Bank Account") at "Originating Banks," sometimes each called an "ODFI," many of which were also federally insured.

b.    Payment processors:  Through their Originating Banks, payment processors operated some Shell Entity Bank Accounts for merchants.  The payment processors facilitated the merchants' debiting of the Consumer Bank Accounts.  These debits sometimes resulted in rejected or "returned" transactions (each a "return"), including returns based on complaints by consumer-victims that the transactions were unauthorized.  Payment processors helped process returns and conducted other financial transactions for the merchants.

1          c.   Signers:  Signers served as nominal owners of Shell

2   Entities and/or Shell Entity Bank Accounts.  Signers generally helped

3   merchants and brokers create, open, and control the Shell Entities

4   and Shell Entity Bank Accounts.

5          d.   Lead list sources:  "Lead lists" contained identifying

6   and financial information of prospective consumer-victims, including

7   bank routing numbers and bank account numbers.  Lead list sources

8   generally sold lead lists (at times referred to as "traffic") to

9   merchants.

10          e.   Brokers:  Brokers helped merchants find payment

11   processors, signers, lead list sources, and other assistance.

12   B.   MEMBERS AND ASSOCIATES OF THE ENTERPRISE

13          4.   The defendants' roles in THE ENTERPRISE were:

14          a.   Defendant COURDY, a resident of Hawaiian Gardens,

15   California, was president of a company headquartered in the Central

16   District of California ("Company A").  Both personally and through

17   Company A, defendant COURDY was primarily a broker and at times a

18   merchant.  Company A maintained one or more email servers located in

19   the Central District of California that routed email communications

20   between Company A personnel, including defendant COURDY and others,

21   and other members and associates of THE ENTERPRISE located outside

22   this district.

23          b.   Defendant FELLERMAN, a resident of Las Vegas, Nevada,

24   was president of a payment processor ("Processor-1").

25          c.   Defendant BENOIT, a resident of Canada and Cyprus, was

26   primarily a merchant and at times a lead list source.  Defendant

27   BENOIT controlled one or more email accounts hosted by a third party

28   located in Arizona.

4

1          d.    Defendant KENNEDY, a resident of Canada, was a
2  merchant who primarily worked with defendant BENOIT.

3          e.    Defendant QUADRI, a resident of Canada, was a merchant
4  and a lead list source.

5          f.    Defendant SHOAIB, a resident of Canada, was a
6  merchant.

7          g.    Defendant BEEBE, a resident of Waianae, Hawaii, was a
8  broker.

9          h.    Defendant YOUNG, a resident of Huntington Beach,
10  California, was a broker who primarily worked for defendant COURDY at
11  Company A and, at times, used a Company A email account.

12          i.    Defendant JOHNSON, a resident of Laveen, Arizona, was
13  a lead list source.

14          j.    Defendant SULLIVAN, a resident, at times, of Coeur
15  d'Alene, Idaho, assisted defendant COURDY in defendant COURDY's role
16  as a broker and defendant BENOIT in defendant BENOIT's role as a
17  merchant.

18          k.    Defendant CROSSWELL, a resident of Long Beach,
19  California, assisted defendant COURDY in defendant COURDY's roles as
20  a broker and as a merchant and, at times, used a Company A email
21  account.

22          l.    Defendant BAUER, a resident of Huntington Beach,
23  California, was a signer who primarily worked for defendant COURDY.

24          m.    Defendant GRABEEL, a resident of Las Vegas, Nevada and
25  Pittsburg, California, was a signer who primarily worked for
26  defendant BENOIT.

27          n.    Defendant VOGEL, a resident of Las Vegas, Nevada, was
28  a signer who primarily worked for defendant BENOIT.

5.     The following persons, each of whose identity is known to the Grand Jury, were members and associates of THE ENTERPRISE:

a.     "Broker-1," a resident of Baltimore, Maryland, was a broker.

b.     "Broker-2," a resident of Buffalo, New York, was a broker.

c.     "Signer-1," a resident of Waianae, Hawaii, was a signer who worked for defendant BEEBE.

d.     "Signer-2," a resident of Montreal, Canada, was a signer who worked for defendant SHOAIB.

C.   PURPOSES OF THE ENTERPRISE

6.     The purposes of THE ENTERPRISE included:

a.     Enriching the members and associates of THE ENTERPRISE through fraud;

b.     Obtaining, preserving, and protecting the proceeds of THE ENTERPRISE through acts of money laundering; and

c.     Protecting THE ENTERPRISE, its members and associates, and its unlawful activities from detection by financial institutions, government agencies, and others.

D.   THE MANNER AND MEANS OF THE ENTERPRISE

7.     Defendants COURDY, FELLERMAN, BENOIT, KENNEDY, QUADRI, SHOAIB, BEEBE, YOUNG, JOHNSON, SULLIVAN, CROSSWELL, BAUER, GRABEEL, and VOGEL, and other members and associates of THE ENTERPRISE, agreed to conduct and participate in the conduct of the affairs of THE ENTERPRISE, through the following means, among others:

a.     Members and associates of THE ENTERPRISE bought and sold lead lists containing identifying and financial information of prospective consumer-victims for the purpose of fraudulently

obtaining money from the consumer-victims by making unauthorized debits against those consumer-victims' Consumer Bank Accounts. Members and associates of THE ENTERPRISE vetted lead lists through a "scrub," by making test credits ("penny" or "micro" credits) to the Consumer Bank Accounts on the lists, and through other means.  The scrubbing process would remove from the lead lists, for example, closed Consumer Bank Accounts that would cause returns on debit attempts.

b.   Members and associates of THE ENTERPRISE created, and caused to be created, Shell Entities, and obtained the use of, and controlled, Shell Entity Bank Accounts.

c.   Members and associates of THE ENTERPRISE recruited domestic signers to, among other purposes, help conceal connections between domestic Shell Entities and Shell Entity Bank Accounts and foreign members and associates of THE ENTERPRISE.  Members and associates of THE ENTERPRISE managed these signers through interstate and foreign email, messaging, and telephone communications.

d.   Using the lead lists and other sources of prospective consumer-victim information, members and associates of THE ENTERPRISE originated debits, and caused debits to be originated, for the benefit of Shell Entities, against Consumer Bank Accounts.  THE ENTERPRISE caused millions of dollars in unauthorized debits against Consumer Bank Accounts for the benefit of the members and associates of THE ENTERPRISE.

e.   To conceal and continue their unauthorized debits against Consumer Bank Accounts and conceal their returns and return rates, and continue to collect the proceeds of the fraud, members and

associates of THE ENTERPRISE took the following actions, among
others:

   i. Members and associates of THE ENTERPRISE created
websites for some Shell Entities to give the impression those
entities were providing legitimate services and products, even though
the websites sometimes lacked functionality and few, if any, actual
customers subscribed to services through them.

   ii. When a Consumer Bank, Originating Bank, or other
person or entity requested proof of authorization ("POA") for a debit
against a Consumer Bank Account, members and associates of THE
ENTERPRISE created false and fraudulent documentation to be presented
to the requester, claiming that the consumer-victim had authorized
the debit, as a payment to a Shell Entity for a subscription for a
service and product provided by the Shell Entity, by signing up for
the Shell Entity's service and product through the Shell Entity's
website.

   iii. Members and associates of THE ENTERPRISE
monitored the Shell Entities' return rates and took steps to ensure
that the return rates did not affect the ability of THE ENTERPRISE to
continue the fraudulent debiting of Consumer Bank Accounts, including
the following:

   (I) Members and associates of THE ENTERPRISE
knew and believed that the number of returns, and a Shell Entity's
percentage of returns in comparison to all debits ("return rate"),
often caused and would have caused scrutiny from the Originating
Banks.  For example, members and associates of THE ENTERPRISE knew
and believed that, for Automated Clearing House ("ACH") debits,
National Automated Clearing House Association ("NACHA") rules imposed

certain thresholds for acceptable return rates and certain

obligations on Originating Banks to monitor return rates.  Members

and associates of THE ENTERPRISE knew that high return rates could

cause the Originating Banks to stop originating debits for the Shell

Entities and therefore restrict the members' and associates' ability

to further debit Consumer Bank Accounts.

(II) Depending on the return rates of the

unauthorized consumer-victim debits, members and associates of THE

ENTERPRISE regularly caused their Originating Banks to originate, for

the Shell Entities, thousands of "micro" debits (also referred to as

"affiliate" or "friendly" items or transactions) against Shell Entity

Bank Accounts at other financial institutions, withdrawing a small

amount of money with each debit.  Since members and associates of THE

ENTERPRISE controlled the Shell Entity Bank Accounts, they knew these

micro debits would not result in returns and would therefore

artificially suppress the Shell Entity return rates at Originating

Banks to levels that, as the members and associates understood and

believed, would avoid Originating Banks' scrutiny and potential

termination of banking services.

iv.  When some consumer-victims discovered the

unauthorized debits, members and associates of THE ENTERPRISE, at

times through purported "customer service" personnel, used refunds

and other means to dissuade consumer-victims from reporting the

debiting Shell Entities to Consumer Banks, government agencies, and

others.

f.  After proceeds of unauthorized debits from the

Consumer Bank Accounts were credited to Shell Entity Bank Accounts,

members and associates of THE ENTERPRISE caused some of the proceeds

to be funneled to other Shell Entity Bank Accounts in order to fund
the micro debits the members and associates of THE ENTERPRISE used to
conceal and disguise Shell Entity return rates and in order to
promote and prolong their scheme.  Members and associates of THE
ENTERPRISE, at times, also caused some of the proceeds to be
transferred from domestic Shell Entity Bank Accounts to accounts
outside the United States in transactions designed in whole and in
part to conceal and disguise the nature, source, ownership, and
control of the proceeds.

E.    THE OBJECT OF THE CONSPIRACY

     8.    Beginning on or about September 18, 2015, and continuing
through January 2022, in Los Angeles County, within the Central
District of California, and elsewhere, defendants COURDY, FELLERMAN,
BENOIT, KENNEDY, QUADRI, SHOAIB, BEEBE, YOUNG, JOHNSON, SULLIVAN,
CROSSWELL, BAUER, GRABEEL, and VOGEL, and others known and unknown to
the Grand Jury, being persons employed by and associated with THE
ENTERPRISE, which was engaged in, and the activities of which
affected, interstate and foreign commerce, knowingly, willfully, and
unlawfully conspired with each other, and with others known and
unknown to the Grand Jury, to violate Title 18, United States Code,
Section 1962(c), that is, to conduct and participate, directly and
indirectly, in the conduct of the affairs of THE ENTERPRISE through a
pattern of racketeering activity, as that term is defined in Title
18, United States Code, Sections 1961(1) and 1961(5), consisting of
multiple acts indictable under:

          a.    Title 18, United States Code, Section 1341 (relating
to mail fraud);

b.   Title 18, United States Code, Section 1343 (relating to wire fraud);

c.   Title 18, United States Code, Section 1344 (relating to financial institution fraud);

d.   Title 18, United States Code, Section 1028 (relating to fraud and related activity in connection with identification documents);

e.   Title 18, United States Code, Section 1029 (relating to fraud and related activity in connection with access devices);

f.   Title 18, United States Code, Section 1956 (relating to the laundering of monetary instruments); and

g.   Title 18, United States Code, Section 1957 (relating to engaging in monetary transactions in property derived from specified unlawful activity).

9.   It was a further part of the conspiracy that each defendant agreed that a conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of THE ENTERPRISE.

F.   OVERT ACTS

10.   In furtherance of the conspiracy, and to accomplish its object, on or about the following dates, defendants COURDY, FELLERMAN, BENOIT, KENNEDY, QUADRI, SHOAIB, BEEBE, YOUNG, JOHNSON, SULLIVAN, CROSSWELL, BAUER, GRABEEL, and VOGEL, together with others known and unknown to the Grand Jury, committed and willfully caused

others to commit the following overt acts, among others, within the

Central District of California and elsewhere:[1]

Overt Act No. 1:   On October 16, 2015, defendant COURDY sent

an email to defendant SULLIVAN, copying defendant BENOIT.  In

response to an email from a payment processor that reported, "Your

current rate of unauthorized returns is at 0.88%, which is above our

allowable rate.  The rate for the previous month was at 0.48%, which

is just below our allowable rate," defendant COURDY wrote defendant

SULLIVAN that Shell Entities "NRG- I Support must get below 50 basis

points immediately at [payment processor].  Please get with me this

morning after you run some percentages of how many micros are

required over the next 3 days to drive that percentage down to

approximately 30 basis points.  The report that Guy is requesting be

corrected, is going to put NRG out of business.  We need to produce

the correct number ourselves and guy will originate whatever is

necessary to fix this problem."

Overt Act No. 2:   On October 23, 2015, defendant SULLIVAN sent

an email to defendants COURDY and BENOIT with the subject "ISupport

Daily Percentages" in which she warned, "There has been no increase

in microdebits as requested this week for I Support.  It is

imperative that the microdebits get increased immediately or at the

rate we are going this account will most likely be shut down

soon...please note that the unauth is either increasing or

maintaining not going down this week at all.  I understand that we

can't stabilize overnight but I would at least like to see 7500 to

---

[1] Unless indicated otherwise in brackets, phrases in quotation marks reproduce the original spellings, spacings, case, emphases, and ellipses.

10,000 over the next week or so and as suggested yesterday if necessary please take the excess from NRG for the next few days.  For instance, you have been depositing 5000 to each account so put 2500 in NRG and 7500 in ISupport...anything to help bring these figures down!"  Included within defendant SULLIVAN's email was a table that showed month-to-date unauthorized returns of 0.40% with micro debits and 3.60% without micro debits, and total returns of 5.87% with micro debits and 53.42% without micro debits.

Overt Act No. 3:   On November 18, 2015, defendant JOHNSON forwarded an email to defendants COURDY and BENOIT with the subject, "guy2k file."  Attached to defendant JOHNSON's email was a lead list containing identifying, employment, and banking information for approximately 2,350 consumer-victims.

Overt Act No. 4:   On December 4, 2015, defendant BENOIT emailed another member and associate of THE ENTERPRISE, Co-Conspirator-1 ("CC-1"), asking that CC-1 make sure that the lead lists they purchased included Internet Protocol ("IP") addresses for the consumer-victims.

Overt Act No. 5:   On December 7, 2015, defendant YOUNG sent an email to CC-1, copying defendants COURDY and BENOIT and attaching two lead lists containing 4,024 and 13,426 leads, respectively, stating, "I would go through though and make sure the consumers age is okay with you guys.  I did notice some (only a few) that were pretty old."

Overt Act No. 6:   On January 12, 2016, in response to defendant COURDY forwarding an email chain from defendants BENOIT and KENNEDY in which defendant KENNEDY compared the returns on traffic from another source and from defendant JOHNSON and commented on the latter, "Regardless, you can see the NSF's are out of wack, PDL

clients [i.e., customers of payday lenders] never have $$$$," defendant JOHNSON suggested that his total return rate was comparable to the other source's.

Overt Act No. 7:   On January 20, 2016, in response to defendant BENOIT forwarding an email chain involving defendants COURDY, BENOIT, and YOUNG in which they discussed an opportunity for defendant BENOIT to make money selling leads, and defendant BENOIT's accompanying note to defendant KENNEDY that "This could be good money for us !  They need customers that were once billed .... But that we will never ever bill again ( Un-auth, cancels, refunds ...etc )  They want to buy these leads ... if we can sell them  I think we could get a dollar each  Let me know," defendant KENNEDY responded to defendant BENOIT, stating, "some gross leads are selling 70 cents....80 cents....and they don't even have 10% valid accounts in there." Defendant KENNEDY continued, "These will be close to 100% valid accounts....so you tell me, the guy who want to sell us a DB is still at 3$ per.  And only 40% of those pass scrub.  I don't know what they are worth but more than a dollar.  Maybe go to 3$ or 2.50 and negotiate from there?"

Overt Act No. 8:   On January 27, 2016, defendant GRABEEL emailed defendant BENOIT, under subject "Salary this week. Randy," requesting payment of "$1754," including $700 salary, $200 each for three bank deposits, including at Bank-1, a federally-insured financial institution, and $150 salary for defendant VOGEL. Defendant GRABEEL also provided and requested information for two other signers.

Overt Act No. 9:   On March 24, 2016, defendant GRABEEL forwarded to defendant BENOIT multiple emails from Bank-1 regarding

online banking for Shell Entity I-Support Group, including an email chain between defendant GRABEEL and Bank-1 personnel in which defendant GRABEEL requested that his contact information be changed from an email address and telephone number controlled by defendant GRABEEL to an email address and telephone number controlled by defendant BENOIT.

Overt Act No. 10:   On May 24, 2016, in response to an email from defendant BENOIT lamenting the number of returns on new leads, stating, "Processing 200 new orders a day .... That's 8,000 Per day .... An today we have 8,040 in returns! ...... guess not much is sticking ?[,]" defendant KENNEDY stated, "New orders are garbage, something you have know for a very long time.  12% will stick.  So on 200 24 will be good the 176 will return.  You shouldn't be shocked at this point."

Overt Act No. 11:   On May 25, 2016, in response to an email from defendant BENOIT acknowledging that building a base of "RO" or recurring orders "takes a huge investment" and that they "must find out the why of the R2,3,4 [return reason codes] and buy better leads," defendant KENNEDY stated, "We have to find a 'sweet spot' as the db ages the retension will get better as these new drop off."

Overt Act No. 12:   On July 12, 2016, at a Bank-1 branch in Huntington Beach, California, defendant BAUER opened a demand deposit account in the name of "ERIC S BAUER DBA 24-7 TECH SUPPORT" (the "BAUER 24-7 Account").  Between July 12, 2016 and December 31, 2019, approximately 800,000 micro debits for Shell Entities Ecloud Secure and My Kloud Box would be originated against the BAUER 24-7 Account.

Overt Act No. 13:   On November 1, 2016, responding to emails from defendants KENNEDY and SULLIVAN concerning processing 100 "test"

transactions against accounts that had been previously successfully debited but were scrubbed out of a suppression file, defendant COURDY sent an email to defendants KENNEDY and SULLIVAN, copying defendant BENOIT, in which defendant COURDY stated, "Steve[,] Please do not place any transactions in the pipeline to deposit in the NRG account other than to transactions we sent you until all have been submitted. You then need to wait three business days without any, so the Bank will keep paying out. If you put the junk transaction through without letting the good clear the bank will have to pay the very high returns expected from the junk transactions with cash from the lower return transactions."

Overt Act No. 14:   On June 8, 2017, defendant CROSSWELL forwarded to defendant COURDY an email from an associate of defendant JOHNSON, attaching an invoice that billed $3,840 for "50% LEAD GENERATION DEPOSIT" and stating, "Amount sent to Musa attached in invoice."

Overt Act No. 15:   On July 4, 2017, defendant JOHNSON sent an email to defendants COURDY and BENOIT with the subject "Attached is perfect traffic" in which defendant JOHNSON wrote, "The only way you are going to get 'blind shot' good traffic is to avoid subprime altogether and have a scrub that's worth a shit.  The attached records are as good as it gets in subprime market.  Hard to believe or understand that out of 18k records I uploaded that you guys have been unsuccessful as you have been.  I gave you deposit dates so you could avoid ISF.  Ill take the unable to locate but when I check against what is uploaded.  FILES HAVE CHANGED!!!"  Attached to defendant JOHNSON's email was a file named "Perfectfiles.xlsx," which

1  was a lead list containing identifying, employment, and banking

2  information for approximately 780 consumer-victims.

3      Overt Act No. 16:   On July 29, 2017, defendant BENOIT sent an

4  email to defendants COURDY and YOUNG, copying defendant SULLIVAN,

5  complaining about high unauthorized returns on leads supplied by

6  defendant JOHNSON.  Defendant BENOIT stated, "this month was maybe

7  the worst I ever had in regards to Un-Auths and RFR 10 !!  .....and

8  the cost associated to all of this, are just crazy !  ....just the

9  490 un-auth @ 25$ = 12,250$ !!!!  .....not counting all other returns

10 at 4 $ a piece[.]  All my accounts are upside down .... And its been

11 a very long time since I have encountered negative results on the

12 overall of my processing !"

13     Overt Act No. 17:   On July 31, 2017, defendant COURDY, copying

14 defendant YOUNG, forwarded to defendant JOHNSON the email from

15 defendant BENOIT referenced in Overt Act No. 16.  Defendant COURDY

16 wrote, "Musa, I forwarded you close to $40k and also have a partner

17 below who has incurred additional cost in processing these

18 substandard traffic. [. . .] [Y]ou assured me that the traffic was

19 appropriate for this business model pointing towards the large number

20 of NSF's as proof that that was the only problem.  As I confirmed to

21 you those NSF's were not acceptable and have considerable phone calls

22 from this particular consumer bas to the bank.  That is exactly why

23 we are receiving phones calls here at the office rather than to the

24 Ukraine were the phone number on the transactions actually

25 rings.  The bank is giving the merchants contact information and the

26 POA's are hitting the office as well.  Your offer to discuss other

27 types of traffic is off the table.  The traffic we requested is the

28 only traffic we have to discuss and at NO additional cost."

1    Overt Act No. 18:   On August 18, 2017, defendant BENOIT

2    forwarded to defendant QUADRI an email chain with defendants GRABEEL

3    and VOGEL, in which defendant GRABEEL wrote to defendant BENOIT,

4    "Debbie cslled me. Her first complaint in all these years....she

5    asked me ...is she going too jail.....i said yes. Ill visit u on

6    jail.....m* * * have ur people handle tjis. Snd let her knoww its

7    done."  Attached to the email chain was correspondence from the

8    Arkansas State Attorney General concerning a complaint by consumer-

9    victim T.B. of an unauthorized debit by Shell Entity Dollar Web Sales

10   ("DWS").

11   Overt Act No. 19:   On August 18, 2017, defendant BENOIT

12   forwarded to defendant QUADRI a draft response concerning consumer-

13   victim T.B.'s complaint, and asked defendant QUADRI to "have that

14   sent from DWS e.mail address .... And make any corrections

15   needed[.]  Pls advise."

16   Overt Act No. 20:   On August 18, 2017, defendant QUADRI

17   forwarded to defendant BENOIT with the note "FYI Done" an email in

18   which defendant QUADRI had impersonated defendant VOGEL to the

19   Arkansas State Attorney General and stated that DWS will refund

20   consumer-victim T.B.

21   Overt Act No. 21:   On September 11, 2017, defendant COURDY

22   received from Broker-2 a forwarded email chain involving other

23   participants.  The email chain included an email from defendant

24   FELLERMAN to Broker-1 with the subject "RE: [Processor-1] ACH Proc'g

25   Agreement[,]" in which defendant FELLERMAN asked Broker-1, "Do they

26   have a transaction data file for one month showing every transaction,

27   the amount, the ACH return code (if returned) and which debit the

28   transaction is (1st, 2nd, 50th, etc.)?  So we can breakout the

'goodness' of the warm debits (that pad the tran count) vs the garbage left behind that is being disguised?  I don't want my ODFI thinking I walk around with my eyes closed just to grab revenue.  Do they re-request prior returns (excluding R02 thru R10, R20 which are not re-requestable at all) like R01 NSF items?  Is that any part of the numbers?  Or is it one and done (unlikely it would seem in this scheme)."

Overt Act No. 22:  On September 26, 2017, in response to an email from defendant BENOIT to defendants COURDY and YOUNG forwarding a proposed proof of authorization falsely claiming to permit Shell Entity Gigatech to debit consumer-victim S.H., defendant YOUNG warned that the first line of the document "doesn't make sense and it also shows a charge of $46.00 and the merchant only bills for $44.95 so we definitely need that changed."

Overt Act No. 23:  On November 17, 2017, defendant SULLIVAN emailed defendants BENOIT and QUADRI concerning the return rates of Shell Entity DWS, cautioning, "Please note that this account is on the verge of receiving a warning for exceeding the 3% threshold for admin returns if we continue to receive returns at the rate they have been coming in.  Please see below for percentages and micro debits needed."  Defendant SULLIVAN's email contained a table listing month-to-date administrative return rates as 2.97% with micro debits and 23.54% without micro debits.

Overt Act No. 24:  On November 18, 2017, in response to defendant BENOIT forwarding defendant SULLIVAN's email referenced in Overt Act No. 23 to defendant QUADRI, with a copy to defendant SULLIVAN and stating, "Start Monday 2750 micros a day ....till

percentage is down under .75[,]" defendant QUADRI replied to defendant BENOIT, copying defendant SULLIVAN, "Will do."

Overt Act No. 25:   On April 16, 2018, defendant KENNEDY sent an email to defendant BENOIT explaining his scrubbing process and suggesting how to respond to a Virginia State Attorney General inquiry about a consumer complaint, stating, "We kill most .GOV on the way in.  I always scroll and look for any suspicious emails.  Banks, GOV police, lawyers etc etc.  Personally I would not provide a POA to an AG unless the AG specifically asks.  I would go with, we reviewed the case of Mr's X and deem it to be a valid sale.  We have since refunded ...etc etc We consider that matter closed.  Again, don't offer up a POA on a platter to an AG."

Overt Act No. 26:   On June 19, 2018, in response to an email from defendant BENOIT to defendant VOGEL stating, "Need again you DL  Front and back  Must me Color scan[,]" defendant VOGEL stated, "Going to wear my driver's license out lol."

Overt Act No. 27:   On June 29, 2018, defendant JOHNSON sent an email to defendant BENOIT with the subject "Data," stating, "Guy, I'm really backed up with leads right now.  I can send over 15k and you can pay me after scrub.  I'll make the price 1.20 cents.  I'll need .35 cents up front.  Send payment today and I'll deliver my Sunday night."

Overt Act No. 28:   On September 20, 2018, defendant BEEBE sent an email to defendants COURDY and YOUNG, stating, "As I told Eddie, we put [Signer-1] on the app for US purposes" and including as an attachment a Processor-1 "New Merchant Questionnaire" for Shell Entity "IKALLS," which listed a single "owner/officer," Signer-1, with address in Waianae, Hawaii, and 51 percent ownership, and which

answered in the negative to the question, "Is there any foreign (non-U.S.) ownership in this Company?"

Overt Act No. 29:   On September 25, 2018, defendant BEEBE forwarded to defendants COURDY and YOUNG an email from defendant SHOAIB with the subject "Articles of ikalls" in which defendant SHOAIB wrote, "Hi John, Please see attached documents.  Thanks[,]" writing "see attached, [Signer-1] is a signer on the operating agreement and is President."  Attached to defendant BEEBE's email was a "Limited Liability Company Operating Agreement of IKALLS, L.L.C." The operating agreement purported to be executed by Signer-1, as Operating Manager, and Signer-2, as President.  Schedule A to the operating agreement listed two members of the company, their addresses, and percentage interest: Signer-1, with address in Waianae, Hawaii, and 51 percentage interest, and Signer-2, with address in Saint-Laurent, Quebec, Canada, and 49 percentage interest.

Overt Act No. 30:   On September 27, 2018, defendant YOUNG sent an email with the subject "iKalls LLC Merchant Submission" to defendant FELLERMAN, copying defendants COURDY and CROSSWELL, in which defendant YOUNG wrote, "Please see the attached merchant submission."  Attached to defendant YOUNG's email were the Processor-1 "New Merchant Questionnaire" for Shell Entity "IKALLS" referenced in Overt Act No. 28 and the "Limited Liability Company Operating Agreement of IKALLS, L.L.C." referenced in Overt Act No. 29.

Overt Act No. 31:   On October 1, 2018, under subject "DBA Filing," defendant CROSSWELL emailed defendant BENOIT, "I am working on filing two DBA's this morning[.]  NRG Support [and] Silver Safe Box[.]  Eric Bauer will be going to get these filed and a bank account open.  If we open these accounts over at [Bank-1], they will

automatically link to the current [Bank-1] account logins you currently have for all other Micro accounts. Is this ok with you or do you want them separated?  Please advise asap."

Overt Act No. 32:  On October 1, 2018, in response to defendant BENOIT's response to the email referenced in Overt Act No. 31, stating "I would prefer [name of a different federally insured financial institution ("Bank-2")]....as we cannot wire out of [initials of Bank-1]", defendant CROSSWELL replied to defendant BENOIT, copying defendant COURDY, "Perfect.  DBA's are out for filing and then bank accounts will be open.  We will keep you updated throughout the day.  Thank You."

Overt Act No. 33:  On October 1, 2018, at a branch of Bank-2 in Long Beach, California, defendant BAUER opened a business checking account in the name of Shell Entity Silver Safe Box (the "BAUER SSB Account"), funded with an opening credit of $100.

Overt Act No. 34:  On October 22, 2018, a member and associate of THE ENTERPRISE caused the BAUER SSB Account to originate a wire transfer in the amount of $21,100 to a business checking account in the name of Shell Entity DWS dba Frontland Park that had been opened by defendant VOGEL at Bank-2 on October 3, 2016.  Between October 1, 2018 and October 22, 2018, the BAUER SSB Account received no credits other than the initial $100 opening credit and 44 credits from Processor-1, all of which, except two credits totaling $90, were labeled as settlement or reserve releases for Shell Entity Silver Safe Box.

Overt Act No. 35:  On November 27, 2018, in response to an email from defendant BEEBE to defendant SHOAIB that copied defendants COURDY and YOUNG and asked defendant YOUNG to "fill Shoby in and

22

better explain" three steps that defendants BEEBE and SHOAIB needed to take to keep their "account functional," defendant YOUNG advised regarding the "micro credit" or "penny credit" that "If the customer's account doesn't exist, doesn't match, etc. (return codes for R-2,3 and 4's usually) this is where they will be caught (roughly 90% or higher) of those returns will be caught here."  Defendant YOUNG also stated, "We have seen merchants that operate in the 30-40% return rate get down to half of that with doing this process.  It not only drops your overall return rate and looks better to the bank, but it drops down your returns costs."  Defendant YOUNG further stated, "On top of all of this there will be micro debit transactions that will probably be needed in order to stay within the NACHA guidelines for unauthorized returns to be under 0.50%," and explained how to use micro debits.

Overt Act No. 36:  On December 28, 2018, defendant FELLERMAN sent an email to defendant COURDY advising that Shell Entity Ecloud Secure had an unauthorized return rate of 1.12% and needed 1,000 "affiliate items," that is, micro debits, "to be safe."

Overt Act No. 37:  On December 29, 2018, in response to an email from defendant COURDY to defendant FELLERMAN that added defendant BENOIT, regarding defendant FELLERMAN's email referenced in Overt Act No. 36 and stating, "Thank you will get this in place will make sure we send it at least 1200 to1500..  Correct Guy?", defendant BENOIT replied to defendant COURDY, "Just sent 4000."

Overt Act No. 38:  On March 5, 2019, in response to defendant BENOIT forwarding to defendant QUADRI notifications from Processor-1 that showed that $0.01 penny credits to 30 bank accounts were returned for various reasons, including R02 Account Closed, R03 No

23

Account, and R04 Invalid Account Number, and in which defendant BENOIT told defendant QUADRI, "I am just sending them to you so you can see what I am dealing with !  On the files you send me I usually put through 150 penny credits a day ... imagine if I would have done this !  Are you going to be able to do something about this ?  Did you buy this from [name] ?  If you were .... And you sold them to me at 2$ ...that is not cool !  I can get that kinda of traffic at .25 per lead from [name]," defendant QUADRI responded to defendant BENOIT, "I didn't get them from that guy..  And no I didn't upsell you leads..  so please stop with accusations..  I will go tomorrow to figure it out."

Overt Act No. 39:  On June 5, 2019, defendant FELLERMAN emailed defendant COURDY under subject "iKalls," stating, among other things, "The articles of incorporation show the principal place of business with a Montreal address, and the notices provision shows a mailing address of a Montreal address ...  These really need to be U.S. if the bank was to actually read the Articles.  Any update on not wiring funds to Canada (Guy has already agreed for his one account doing such) for iKalls?  And 100% ownership for [Signer-1] (side deal between Beebe and Shoba) ?"

Overt Act No. 40:  On June 10, 2019, defendant FELLERMAN emailed defendant COURDY under subject "iKalls," stating, "Assuming we can move them to the new bank once we get full U.S. ownership, Amended articles that remove [Signer-2] and also don't reflect a foreign mailing address, no more Canada wires, etc.  I think another good step to keeping them forever might be if they don't run their 1st two transactions thru us (many poa requests).  Perhaps a thought is

drafts or ACH done elsewhere?  They would still run the penny credits though to test the account.  Thoughts on this?"

Overt Act No. 41:  On June 18, 2019, defendant YOUNG emailed defendant FELLERMAN, copying defendants COURDY and CROSSWELL, and others, under subject "iKalls Updated Documents."  Defendant YOUNG stated, "Lin, Please find the attached requested documents which reflect the LLC's new Operating Agreement, Updated EIN and the Purchase Agreement between buyer and seller."  Attached to defendant YOUNG's email was a "Membership Interest Purchase Agreement," purporting to be signed by Signer-1 on June 14, 2019 in the State of Hawaii and by Signer-2 on June 14, 2019 in Montreal, Canada, which purported to demonstrate that Signer-2 transferred all interest in Shell Entity iKalls to Signer-1.

Overt Act No. 42:  On August 22, 2019, in an email exchange regarding the return of 1,500 micro debits that had been originated against the BAUER 24-7 Account at Bank-1, defendant FELLERMAN emailed defendant BENOIT, mistaking the BAUER 24-7 Account's signer to be defendant GRABEEL and stating, "This is crazy. I called [Bank-1] support myself and explained everything ... they won't tell me anything. Whether the account is open, closed, frozen , or anything unless the signer (or someone pretending to be the signer) is on the phone ... In theory, I could have pretended to be Randy since I have Randy's personal info on the app ... but I was too darn honest. Before I contact my bank ACH dept to contact [Bank-1] ACH dept to figure it out, I think you and I should call [Bank-1] ourselves in the morning PST and you pretend to be Randy (for confirmation we will need last 4 of his SSN (and perhaps his birthdate) which is on the app we have anyway)?"

1      <u>Overt Act No. 43</u>:   On October 15, 2019, under the subject "MKB

2    Passport/DL," defendant COURDY forwarded to defendants YOUNG and

3    CROSSWELL an email from defendant BENOIT forwarding an email from

4    defendant GRABEEL, attaching a scan of defendant GRABEEL's passport,

5    driver's license, and other paperwork.

6      <u>Overt Act No. 44</u>:   On February 10, 2020, defendant COURDY

7    emailed defendant SHOAIB, copying defendants BEEBE and YOUNG, stating

8    "Shoby[,] Please read email received from Lin At [Processor-1].  Do

9    not submit new traffic until we connect you with the scrub Mike has."

10   Defendant COURDY continued, "This account is going to blow up if we

11   cant get the re5urns under control for new business."  Copied in

12   defendant COURDY's email was the following message from defendant

13   FELLERMAN:  "You probably also need to get involved with where they

14   are buying their data.  The penny credit file from last week had 95%

15   returns.  The bank will surely ask me to explain those results."

16     <u>Overt Act No. 45</u>:   On February 10, 2020, in an email exchange

17   following the email from defendant COURDY referenced in Overt Act No.

18   44, defendant YOUNG responded to defendant BEEBE, copying defendants

19   COURDY and SHOAIB:  "I'll have to get you the file format first thing

20   in the morning. You don't need all of the information to be filled

21   out though, just routing and account and it will give you back a

22   positive or negative result file.  It might also be wise to have the

23   lead broker just log in before selling any leads, upload the file and

24   see how many are actually clear before buying them. I mentioned this

25   before to Shobie as well and it's why it scrubs just based on minimal

26   info rather than someone having to provide everything."

27     <u>Overt Act No. 46</u>:   On February 10, 2020, after defendant BEEBE

28   asked about cost of the scrub described above in Overt Act No. 45,

defendant YOUNG responded, copying defendant COURDY, "It's free, it's just an internal suppression file. But it has millions of records and a ton of old payday loan data and 'call Center' data. It may not get rid of any results if the leads you're buying are brand new verified. But if they're older it will at least help, again it's free."

Overt Act No. 47:   On April 8, 2020, defendant BENOIT sent an email to defendant CROSSWELL, copying defendants COURDY and YOUNG, with the subject "FW: Commission Reports" and with four spreadsheets attached, comprising "Accountholder Distribution Reports" for Shell Entities DWS, Ecloud Secure, My Kloud Box, and Silver Safe Box.  The reports listed, for each Shell Entity, consumer-victim debits totaling the following approximate amounts over the following timeframes:

| Shell Entity | Total Debits | Starting | Ending |
| --- | --- | --- | --- |
| DWS | $2,307,436 | March 16, 2018 | March 26, 2020 |
| Ecloud Secure | $4,530,865 | August 4, 2017 | March 26, 2020 |
| My Kloud Box | $4,192,915 | September 20, 2017 | March 26, 2020 |
| Silver Safe Box | $1,868,327 | July 6, 2018 | March 26, 2020 |

Overt Act No. 48:   On April 9, 2020, in response to an email from defendant BENOIT with the subject "A PACKAGE ARRIVED AT FLAMINGO RD ... NEED IT PICKED UP ASAP" in which defendant BENOIT advised, "Need copy of content ... and there will be a token inside the package ( [name of Bank-2] )," defendant VOGEL replied, "Hes closing now will be open at 9 tomorrow I'll be there at 9 and I'll pick it up and send it to you."

Overt Act No. 49:   On April 15, 2020, defendant BENOIT forwarded to defendant COURDY an email from defendant SULLIVAN to

27

defendant BENOIT with the subject "DWS Said Commission" to which defendant SULLIVAN had attached a spreadsheet listing weekly payouts for Shell Entity DWS from Processor-1, stating, "Eddie, Here is the report Jenny sends me everyweek to settle my partner ... who is 50% with me on this account."  Defendant BENOIT continued, "Also, she prepares the % (3.5%) for ECL and SSB for Eric .... Can this be done by you guys as well ? (She sends that report to Veronica every week)."

Overt Act No. 50:   On April 24, 2020, defendant BENOIT forwarded to defendant KENNEDY an email from defendant FELLERMAN regarding Shell Entity CloudNV in which defendant FELLERMAN warned defendant BENOIT, "Not sure if you are aware but in both Feb and March (these last 2 months) **Cloud NV was over 0.50% unauthorized returns.**  Can we get extra affiliate traffic in next week?  Is there any way you can add an extra 1,500 to 2,000 items each day <u>on top of the normal week's traffic</u> to ensure April is well below 0.50% ?  I'm not sure why they are the only 'high' chargeback client in the portfolio right now but as you know, the bank starts to ask questions when there are two consecutive months of greater than 0.50%."  With the forwarded email, defendant BENOIT asked defendant KENNEDY to "send 2250" micro debits "right away."

Overt Act No. 51:   On April 24, 2020, in response to defendant BENOIT's email sent the same day and referenced in Overt Act No. 50, defendant KENNEDY replied, "Done done done!  Keep in mind my volume has doubled in 2 months!  Alot of my orders are 1 month and 2 monthers, with all that is going on financially in the US we are seeing a spike in R10's with those new clients."

1        Overt Act No. 52:   On July 16, 2020, defendant COURDY sent an

2    email to defendants BENOIT and SHOAIB with the subject "Better

3    Quality Traffic."  Defendant COURDY wrote, "Guy, I spoke with Shoby

4    this morning regarding setting up a conference call with you to

5    discuss the possibilities of assisting Shoby in acquiring better

6    quality traffic from you directly.  Could we possibly do that call at

7    8:30AM my time, 11:30 Montreal?  Please advise if that works.  If so,

8    I'll initiate the call, connect you two then provide cell numbers in

9    an email."

10       Overt Act No. 53:   On September 1, 2020, in response to an

11   email from defendant BENOIT, copying defendant QUADRI, with the

12   subject "NEW REPORTING FOR DWS/[Processor-1] PROCESSING" and asking

13   defendant COURDY to "please get in contact with" defendant QUADRI, to

14   whom defendant BENOIT referred as his "partner," defendant COURDY

15   replied, copying defendant QUADRI, "Sayyid, Please let me know a good

16   time for you when you are in front of a computer and I will make

17   myself available for a call that will include the actual reports

18   generated from the processors online reports.  We also audited the

19   actual cash deposits received from the processors and then match all

20   transfers paid out directly to you.  I will email you a complete set

21   of the audit results and will discuss them with your accountant as

22   well if you have additional questions."

23       Overt Act No. 54:   On September 17, 2020, defendant QUADRI,

24   while impersonating defendant VOGEL, sent an email to three email

25   addresses associated with a payment processor ("Processor-2"),

26   copying defendant COURDY and blind-copying defendant BENOIT, with the

27   subject "DWS Audit" and stating, "I have appointed a person who will

28   be auditing our account with [Processor-2].  I am authorising him to

discuss on my behalf. His name is Eddie Cordy.  Please take note as he will be contacting [Processor-2] to discuss."

Overt Act No. 55:  On November 6, 2020, at the request of defendant CROSSWELL, defendant BAUER texted to defendant CROSSWELL images of correspondence from the Better Business Bureau, received by defendant BAUER, regarding complaints of unauthorized debits by Shell Entity Cloud Block Storage against the bank accounts of consumer-victims D.H. and J.W.

Overt Act No. 56:  On November 18, 2020, defendant COURDY emailed defendant SHOAIB, under subject "1K CA Leads," stating, in part, "Shobi, Please find the attached 1k CA leads," and attaching a file named "Shobi 1k Leads.xlsx," which was a lead list that contained 1,000 leads, all with addresses in California.

Overt Act No. 57:  On December 1, 2020, defendant COURDY emailed defendant BENOIT, copying defendant CROSSWELL, under subject "11k Leads Minus 1k to Shobi," stating, "Hi Guy, We just uploaded the 11k original file minus the 1k CA transactions we sent to Shobi."

Overt Act No. 58:  On December 4, 2020, in a text message exchange in which defendant BAUER sent defendant CROSSWELL a telephone number and stated, "this guy just called he wants his money back from gigatech please call him," defendant CROSSWELL responded, "Ok but I'm getting yelled at we aren't getting names I need names if you can write first and last cause I send this to another person to call I can't just send numbers."  Defendant BAUER replied, "They're so mad they don't want to give a name half of them from now on I'll start getting."

<u>Overt Act No. 59</u>:   On December 10, 2020, defendant BAUER sent defendant CROSSWELL multiple text messages that provided the names and telephone numbers for consumer-victims H.C. and M.M.

<u>Overt Act No. 60</u>:   On December 10, 2020, defendant CROSSWELL emailed defendant BENOIT the names and telephone numbers of consumer-victims D.Q., H.C., and M.M., and wrote, "The following customers have called regarding their account. Please note Eric Bauer does his best to get the consumers name, some are willing and some are not so compliant. I get the information directly from him."

<u>Overt Act No. 61</u>:   On January 1, 2021, defendant BENOIT forwarded to defendant COURDY an email from defendant FELLERMAN regarding Shell Entity Gigatech that advised of high unauthorized return rates and requested "a lot of 'extra' affiliate items next week to ensure we get the rolling 60 day unauth return rate down below .50% ... I would recommend at least 15,000 next week (if not more) as extra affiliate items above and beyond the normal affiliate volume for the week."   In connection with the forwarded email, defendant BENOIT stated to defendant COURDY, "If you have time lets talk about the below e.mail."

<u>Overt Act No. 62</u>:   On March 16, 2021, defendant BENOIT caused a wire transfer in the amount of $5,000 to be sent to fund a domestic bank account ("Account A") that was managed by Company A personnel and used to fund micro debits for Shell Entities controlled by both defendants BENOIT and SHOAIB.

<u>Overt Act No. 63</u>:   On April 19, 2021, at the email request of Company A personnel, defendant SHOAIB caused a wire transfer in the amount of $7,000 to be sent to Account A.

COUNTS TWO THROUGH SEVEN

[18 U.S.C. § 1343]

[DEFENDANTS COURDY, FELLERMAN, BENOIT, KENNEDY, QUADRI, SHOAIB,

BEEBE, YOUNG, JOHNSON, SULLIVAN, CROSSWELL, and BAUER]

11.   The Grand Jury realleges paragraphs 1 through 7 and 10 of this Indictment here.

A.   THE SCHEME TO DEFRAUD

12.   Beginning on or about September 18, 2015, and continuing through January 2022, in Los Angeles County, within the Central District of California, and elsewhere, defendants COURDY, FELLERMAN, BENOIT, KENNEDY, QUADRI, SHOAIB, BEEBE, YOUNG, JOHNSON, SULLIVAN, CROSSWELL, and BAUER, knowingly and with intent to defraud, devised, participated in, and executed a scheme to defraud financial institutions, as defined in Title 18, United States Code, Section 20, including Originating Banks and Consumer Banks, as to material matters, and to obtain money and property from the Originating Banks and Consumer Banks by means of material false and fraudulent pretenses, representations, and promises, and the concealment of material facts.

13.   The fraudulent scheme operated, in substance, in the manner set forth in paragraph 7 of this Indictment.

B.   THE USE OF THE WIRES

14.   On or about the dates set forth below, in Los Angeles County, within the Central District of California, and elsewhere, the following defendants, for the purpose of executing the above-described scheme to defraud affecting a financial institution, transmitted, and caused the transmission of, the following items by

means of wire and radio communication in interstate and foreign

commerce:

| COUNT | DATE | DEFENDANTS | ITEM WIRED |
|-------|------|-----------|-----------|
| TWO | 11/1/2016 | COURDY, BENOIT, KENNEDY, and SULLIVAN | Interstate email from defendant COURDY to defendant BENOIT described in Count One, Overt Act No. 13 |
| THREE | 7/4/2017 | COURDY, BENOIT, and JOHNSON | Interstate email from defendant JOHNSON to defendant COURDY described in Count One, Overt Act No. 15 |
| FOUR | 12/29/2018 | COURDY, FELLERMAN, and BENOIT | Interstate email from defendant BENOIT to defendant COURDY described in Count One, Overt Act No. 37 |
| FIVE | 6/18/2019 | COURDY, FELLERMAN, SHOAIB, BEEBE, and YOUNG | Interstate email from defendant YOUNG to defendant FELLERMAN described in Count One, Overt Act No. 41 |
| SIX | 9/17/2020 | COURDY, BENOIT, and QUADRI | Interstate email from defendant QUADRI to defendant COURDY described in Count One, Overt Act No. 54 |
| SEVEN | 12/10/2020 | BENOIT, CROSSWELL, and BAUER | Interstate email from defendant CROSSWELL to defendant BENOIT described in Count One, Overt Act No. 60 |

FORFEITURE ALLEGATION ONE

[18 U.S.C. § 1963]

1.    Pursuant to Federal Rule of Criminal Procedure 32.2, notice is hereby given that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 1963, in the event of any defendant's conviction of the offense set forth in Count One of this Indictment.

2.    Any defendant so convicted shall forfeit to the United States of America the following:

    a.    Any interest the convicted defendant has acquired or maintained as a result of such offense;

    b.    Any interest in, security of, claim against, or property or contractual right of any kind affording a source of influence over, any enterprise which the convicted defendant has established, operated, controlled, conducted, or participated in the conduct of, as a result of such offense;

    c.    Any property constituting, or derived from, any proceeds which the convicted defendant obtained, directly or indirectly, from racketeering activity as a result of any such offense; and

    d.    To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraphs (a), (b), and (c).

3.    Pursuant to Title 18, United States Code, Section 1963(m), any defendant so convicted shall forfeit substitute property, up to the total value of the property described in the preceding paragraph if, as the result of any act or omission of said defendant, the property described in the preceding paragraph, or any portion thereof

34

(a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FORFEITURE ALLEGATION TWO

[18 U.S.C. § 982]

1.   Pursuant to Rule 32.2(a) of the Federal Rules of Criminal Procedure, notice is hereby given that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 982(a)(2), in the event of any defendant's conviction of the offenses set forth in any of Counts Two through Seven of this Indictment.

2.   Any defendant so convicted shall forfeit to the United States of America the following:

a.   All right, title and interest in any and all property, real or personal, constituting, or derived from, any proceeds obtained, directly or indirectly, as a result of the offense; and

b.   To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph (a).

3.   Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b), any defendant so convicted shall forfeit substitute property, up to the total value of the property described in the preceding paragraph if, as the result of any act or omission of said defendant, the property described in the preceding paragraph, or any portion thereof: (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been

substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.


A TRUE BILL


          /S/
Foreperson


E. MARTIN ESTRADA
United States Attorney


MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division

RANEE A. KATZENSTEIN
Assistant United States Attorney
Chief, Major Frauds Section

KRISTEN WILLIAMS
Assistant United States Attorney
Deputy Chief, Major Frauds Section

MONICA E. TAIT
Assistant United States Attorney
Major Frauds Section

AMANDA N. LISKAMM
Director, Consumer Protection Branch
United States Department of Justice

WEI XIANG
MEREDITH B. HEALY
AMY P. KAPLAN
Trial Attorneys
Consumer Protection Branch
United States Department of Justice